UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK THOMPSON,<br><br>    vs.<br><br>UNITED NETWORK FOR ORGAN SHARING; and MASS GENERAL BRIGHAM INCORPORATED<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>**(1) VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964;**<br><br>**(2) VIOLATION OF SECTION 98 OF CHAPTER 272, CRIMES AGAINST CHASTITY, MORALITY, DECENCY AND GOOD ORDER**<br><br>**DEMAND FOR JURY TRIAL** |

2432942.1

## COMPLAINT

Plaintiff Mark Thompson ("Plaintiff" or "Mr. Thompson") brings this Complaint against the United Network for Organ Sharing ("UNOS") and Mass General Brigham Incorporated ("Mass General" and collectively, the "Defendants") and alleges as follows:

## INTRODUCTION

1. For more than two decades, UNOS and its affiliated transplant hospitals used what is known as the race-based coefficient to artificially increase the observed kidney function (eGFR) scores for Black kidney disease patients. The race-based coefficient delayed Black kidney disease patients from being added to the kidney transplant waitlist and resulted in Black candidates waiting much longer for kidney transplants than similarly-situated non-Black candidates.

2. Use of the race-based coefficient was not the result of any valid scientific or peer-reviewed studies. Instead, developers of the race-based coefficient postulated that Black Americans showed increased levels of creatinine extraction because they have greater muscle mass than non-Black Americans; i.e., they relied solely on a defunct, eugenics-style racial stereotype.

3. Making medical policy based on racial stereotypes harmed all Black Americans waiting for a kidney. This lawsuit focuses on one of them—Mr. Mark Thompson.

4. Mr. Thompson enjoyed a successful career in law enforcement. He previously served as a captain in the Sheriff's office and as a corrections officer. Mr. Thompson was a productive member of society who took great pride in putting himself at risk to protect others.

5. Mr. Thompson is also a family man. He is married and has four kids, including one still in high school, and two grandchildren.

6. Mr. Thompson was first diagnosed with polycystic kidney disease in or about 2007 or 2008. His condition was monitored and his eGFR score was regularly measured, however, no

one ever informed Mr. Thompson that the race-based coefficient was being applied to his eGFR scores, or that this application could delay his referral to the kidney waitlist.

7. In July of 2017, Mr. Thompson's kidney disease worsened to the point he was forced to begin dialysis. Mr. Thompson understands that he was first added to the waitlist at this time.

8. For the next nearly seven years, Mr. Thompson has undergone debilitating dialysis treatments, alternating between at home, and in the dialysis clinic. Neither allow Mr. Thompson to live a normal life.

9. The at home dialysis treatments require Mr. Thompson to place a sharp needle into his arm, however, because he is often physically unable to do so, Mr. Thompson is required to enlist his wife, who has no medical training, to be his at-home nurse.

10. This process requires Mr. Thompson to repeatedly cut his own scab off using a plastic knife provided to him. This is particularly distressing to Mr. Thompson because it brings back traumatic memories from when he was a corrections officer and witnessed a prisoner cut open his own arm in an attempt to kill himself.

11. Further, the in-home dialysis leaves Mr. Thompson physically and emotionally exhausted, and unable to work. At different points, the prescribed amounts of dialysis have varied, but he has generally been required to undergo at least 4–5 hours per day, five days a week. Mr. Thompson's diet and fluid intake have also been extremely limited during these times.

12. Mr. Thompson was also required to permanently attach a hose to his stomach that would attach to the dialysis machine, which when he was not in treatment, had to be curled up and bound to his stomach, requiring the purchase of larger clothing.

13. When Mr. Thompson has undergone in-clinic dialysis, the burden has been

similarly awful. In-clinic dialysis also leaves Mr. Thompson emotionally and physically drained and unable to work or maintain a normal life; to enjoy hobbies or spending time with his family.

14. For instance, Mr. Thompson's grandchildren live out-of-state. Because he is too sick to travel, Mr. Thompson is unable to visit his grandchildren, and he desperately wishes he were able to do so.

15. As another example, Mr. Thompson used to spend his spare time coaching football and lifting weights. But his long stint on dialysis has removed his physical and mental ability to continue coaching football or lifting weights. Mr. Thompson is also no longer able to volunteer with Shriners to help children with burn injuries and orthopedic issues. He misses these aspects of his life dearly.

16. Mr. Thompson has also suffered serious health problems because of his extended dialysis treatments. For example, dialysis has caused significant cardiac complications for Mr. Thompson, resulting in nearly 20 cardiac/artery related surgeries. It has also caused a condition called calcinosis cutis, which results in calcium deposits in Mr. Thompsons's body, that are extremely painful and leave Mr. Thompson unable to walk more than 10 feet.

17. On or about November of 2019, Mr. Thompson first visited Mass General. They performed a kidney transplant evaluation. Upon information and belief, Mass General obtained copies of Mr. Thompson's earlier medical records on or about this time.

18. Over the following years, Mr. Thompson's kidney disease worsened to the point where, on April 2, 2021, Mr. Thompson was forced to undergo a surgical procedure to remove both of his kidneys. Mr. Thompson currently lives with no kidneys. On or about this time, it was discovered that both of Mr. Thompson's kidneys had become cancerous while he waited for a donor kidney.

19. Because of Mr. Thompson's cancer diagnosis, Mass General advised Mr. Thompson that he must be listed as "inactive" on UNOS's transplant list for five years, certain of the antirejection drugs required after receiving a transplant serving to exacerbate the risk of further cancer developing. This means that the earliest Mr. Thompson can be considered for a kidney transplant will be 2026.

20. Mr. Thompson has been forced to have conversations with his wife and children about the possibility that he may die waiting for a kidney. The emotional distress this entire ordeal has caused to Mr. Thompson and his family is severe to the point it is difficult to capture in words.

21. The source of Mr. Thompson's physically and mentally traumatizing fight with kidney disease and cancer? Defendants' use of the race-based coefficient to taint Mr. Thompson's—and countless other Black patients'—eGFR scores. Defendants now admit these scores were artificially adjusted in a racist manner from the beginning.

22. In June of 2022, UNOS admitted the racially discriminatory nature of the race-based coefficient for Black Americans. Thereafter, UNOS approved "a measure to require transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function." In its press release, UNOS explained:

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.[1]

Despite prohibiting future use of the race-based coefficient, for six months, UNOS did nothing to adjust wait times for Black Americans already on the kidney waitlist.

---

[1] This Press release is publicly available at https://unos.org/news/optn-board-approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.

23. In January of 2023, UNOS instructed donor hospitals to notify Black candidates of the policy change and investigate whether Black members of their waitlists were eligible for a wait-time modification, but UNOS gave donor hospitals *an entire year* to complete this process, until January of 2024.

24. Through this process, in August of 2023, Mr. Thompson was first informed by Mass General that he was entitled to a wait time adjustment. That is, Mr. Thompson was first placed on UNOS's national kidney waitlist when he began dialysis, but should have been added on September 12, 2016, per a qualifying lab test, absent application of the race-based coefficient. Mass General should have reviewed this test in November of 2019, and notified UNOS that Mr. Thompson qualified to begin accruing wait time in September of 2016, but they did not, resulting in injuries to Mr. Thompson.

25. This adjustment does little for Mr. Thompson now as his health has already worsened to the point he is inactive on the national kidney waitlist, until at least 2026. Indeed, the only time period where Mr. Thompson was active on the waitlist was from 2017 to 2021. During this time period, Mr. Thompson was not given credit for the proper amount of qualifying wait time, prejudicing his chance to receive a donor kidney.

26. Also during this time period, Mr. Thompson developed cancer that required removal of both of his kidneys. This could have been avoided—Mr. Thompson would have had nearly five years on the kidney waitlist before his cancer diagnosis but for use of the race-based coefficient. The average wait time for a kidney is approximately three to five years, but upon information and belief, many similarly situated, non-Black candidates receive kidney transplants with significantly less wait time.

27. Moreover, with Mr. Thompson inactive until 2026, he now will not receive "fair"

consideration for a kidney, i.e., be considered with his appropriate amount of wait time, until approximately a decade after he first should have qualified for the national kidney waitlist.

28. There must be serious consequences for hospitals and transplant organizations that engage in such racist discrimination.

## PARTIES

29. Mr. Thompson is an individual residing in Franklin, Massachusetts.

30. Mr. Thompson is informed and believes, and hereby alleges, that Defendant UNOS is a Virginia nonprofit corporation with its principal place of business in Richmond, Virginia.

31. Mr. Thompson is informed and believes, and hereby alleges, that Defendant Mass General is a non-profit corporation with its principal place of business in Boston, Massachusetts.

## JURISDICTION AND VENUE

32. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 because Mr. Thompson asserts a federal cause of action alleging racial discrimination. This Court further has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

33. Venue in this district is proper pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this District and has been affected by Defendants' unlawful policies and procedures within the District, Mass General's principal place of business is within this District, and Mass General's alleged actions have occurred within the District. Thus, a substantial part of the events or omissions that gave rise to the claims asserted herein occurred within this District.

34. This Court has personal jurisdiction over UNOS because UNOS conducts operations within Massachusetts by virtue of its management of the kidney donor list for all patients residing within the State, including Plaintiff. UNOS makes decisions as to which patients

residing in Massachusetts will be offered donor kidneys.

35. This Court has personal jurisdiction over Mass General because Mass General maintains its principal place of business within the State, and harmed Plaintiff by virtue of the unlawful conduct alleged herein within this State.

## GENERAL ALLEGATIONS

### A. The national kidney transplant waitlist is controlled by the Defendants, and wait time is the primary factor considered in awarding donor kidneys.

36. In 1984, Congress passed the National Organ Transplant Act ("NOTA"), creating the Organ Procurement and Transplantation Network ("OPTN"), which was tasked with maintaining a national registry for organ matching. Under the Act, this registry was to be operated by a private, non-profit organization under federal contract.[2]

37. Since then, UNOS has acted as that private, non-profit organization. As its website declares, UNOS "[m]anag[es] the national transplant waiting list, matching donors to recipients 24 hours a day, 365 days a year." UNOS establishes and implements policy about how donor kidneys will be awarded to patients with kidney disease.

38. UNOS is contractually obligated to manage the national kidney waitlist, but does not allow kidney disease patients to apply for inclusion on the kidney transplant waitlist directly through UNOS.

39. To be placed on the national kidney transplant waitlist, a patient must first visit one of 200+ transplant hospitals and receive a referral from his physician. In this way, the transplant hospitals, like Mass General, serve as gatekeepers to patients seeking to be placed on the national kidney waitlist.

40. UNOS must approve these transplant hospitals before they are eligible to refer patients to the kidney transplant waitlist. Hospitals like Mass General must agree to be bound by

---

[2] Patients can also seek a kidney from a private donor, such as a family member or friend, at the same time as they wait for a kidney on the national waitlist.

UNOS's published policies and procedures to act as a transplant hospital. They then act as UNOS's agent in managing the national transplant waitlist.

41. The national kidney waitlist is maintained using UNOS software, known as UNet. When a new patient is added to the waitlist, the referring hospital enters the patient's name and relevant medical information, including eGFR scores, into the UNet software, which tracks patient medical information and wait time.

42. Each time a donor kidney becomes available, UNet's algorithm considers the information maintained in UNet, generates a list of potential matches, and ranks potential matches on the national kidney waiting list. These kidneys are then offered to patients through the transplant hospitals, in accordance with the UNet-generated rankings. This ranked list is known as a match run. These kidneys are then offered to patients through the transplant hospitals, in accordance with the UNet-generated rankings.

43. In the UNet algorithm, qualifying wait time is worth 1/365 points per day, or one point per year. These wait time points are a significant factor in determining candidates' ranking in UNet's match runs, and ultimately which candidate will be awarded any particular kidney.

44. Indeed, because all other factors for which candidates are assigned points are race-neutral, wait time acts as a sort of tie breaker between similarly situated Black and non-Black candidates. From the point the race-based coefficient was first applied, until their wait-times were adjusted to eliminate consideration of race, Black candidates accrued less wait time than similarly situated non-Black candidates. Non-Black candidates therefore appeared higher in match runs, and were awarded kidneys first.

45. Importantly, referral to the waitlist does not automatically start the clock on qualifying wait time. Generally, to accrue qualifying wait time, either a patient's eGFR score must fall below 20 ml/min or the patient must begin dialysis.

**B.      The Defendants applied a racially discriminatory coefficient to Black patients' eGFR scores**.

46.      UNOS is responsible for enacting policy that determines which patients receive which donor kidneys. In this way, UNOS offers as one of its strategic goals to "[p]rovide equity in access to transplants[.]" UNOS has fallen far short of its stated goal.

47.      For decades, the race-based coefficient was applied to artificially inflate eGFR scores for Black Americans, overstating their kidney function by 16–18%, based on the underlying assumption that Black Americans have greater muscle mass and thus naturally have more creatinine in their bodily systems.

48.      As noted above, patients do not begin accruing wait time on the national kidney waitlist until their eGFR score reaches 20 ml/min. But for Black patients, even when their unadjusted eGFR score fell below 20 ml/min, the race-based coefficient artificially inflated their eGFR scores above 20 ml/min, preventing them from qualifying to accrue wait time. Thus, Black patients' eGFR scores had to fall well below 20 ml/min before they began to accrue wait time.

49.      This practice led to many Black kidney disease patients never qualifying for wait time by eGFR score, their addition to the waitlist delayed until the start of dialysis (which is recommended when kidney function falls below 15 ml/min). This is what happened to Mr. Thompson.

50.      UNOS's policy encouraged and allowed for use of the race-based coefficient, and UNOS knowingly used modified eGFR scores and manipulated wait times when ranking patients for kidney transplants. Specifically, UNOS is and has at all times been aware that its UNet software includes an algorithm that uses wait time as the primary factor in ranking patients for donor kidneys, and that its UNet software includes wait times for Black patients that have been manipulated by application of the race-based coefficient, including Mr. Thompson's original wait time calculation. To be clear, this modification was made to Black patients' eGFR scores entirely because of their race and was not applied to other racial groups.

51.      There has never been any serious scientific research to support use of the race-based

coefficient to artificially increase Black patients' eGFR scores. Instead, the race-based coefficient is based on eugenics-style racism and stereotypes that assume Black Americans are more physically fit than White Americans and other racial groups.

52. This, of course, is junk science supported only by racial stereotypes, and not any valid scientific studies. As described in an article titled *Systemic Kidney Transplant Inequities for Black Individuals: Examining the Contribution of Racialized Kidney Function Estimating Equations*, the theory supporting the race-based modification to Black patients' eGFR scores has "not been substantiated by rigorous scientific evidence[.]"

53. Years before UNOS took any action to review its policy allowing for use of the race-based coefficient, the practice was criticized by doctors for its racially discriminatory nature. For example, in November of 2011, Dr. Toni Martin published an article in the *American Journal of Kidney Diseases* that questioned the practice, explaining that when she attempts to explain the policy to Black patients, she "get[s] a snort of disbelief[,]" and noting the history of purported genetic differences being used against Black Americans against a backdrop of "separate and unequal."[3]

54. Use of the race-based coefficient seriously diminishes Black patients' chances of receiving a donor kidney. For Black patients that overcome the odds and do receive a kidney from the national waitlist, their wait time is still significantly increased. Again, because of this eGFR manipulation, many Black patients never qualified to accrue wait time because of their eGFR score, and only began to accrue wait time when they began dialysis.

55. All other factors being equal, the above-described practices have resulted in non-Black patients receiving many kidneys that would otherwise have been given to Black applicants had their wait time been calculated without consideration of race.

---

[3] To be clear, Mr. Thompson was unaware of this article. Mr. Thompson was further unaware that his race affected his position on the waitlist, and unaware the race-based coefficient was applied to his eGFR scores, until August of 2023, when he received a letter from Mass General advising as to his entitlement to a wait time adjustment. This is not surprising because the race-based coefficient was generally applied covertly without notice to or discussion with patients.

56.     The failure to receive donor kidneys has caused significant harm to Black Americans. In addition to the toll taken by extended dialysis treatments for those lucky enough to ultimately receive a successful transplant, albeit delayed, the unfortunate reality is that many Black Americans who could have survived if fairly considered for a donor kidney have already passed away. Mr. Thompson may very well face the same fate.

### C.    Even after UNOS admitted that the race-based coefficient discriminates against Black Americans, Defendants refused to timely address the problem.

57.     In June 2020, UNOS acknowledged the racial inequity plaguing the transplant system and the need for reform. In an article found at https://unos.org/news/racial-equity-in-transplantation/, UNOS professed a "commitment" to "saving and improving lives through transplantation, regardless of background, including race and ethnicity." But the race-based coefficient would remain in effect for years to come.

58.     In June 2022, UNOS admitted the racially discriminatory nature of the race-based coefficient for Black Americans, approving "a measure to require transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function." In its press release, UNOS explained that

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.[4]

59.     UNOS posted the following passage on its website:

---

[4] This Press release is publicly available at https://unos.org/news/optn-board-approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.



**What are other issues with the race variable in eGFR?**

EGFR calculations rely on a binary approach to race. When the race variable is used in formulas, eGFR calculators only offer two response options: "Black" or "Not Black."

These options do not include a designation for mixed race or multi-racial individuals, and do not account for the existing genetic diversity within the Black population. The concept of race is a social construct and an unreliable proxy for genetic difference, therefore not a biological marker or clinical measure.

60. UNOS's policy officially changed on July 27, 2022, with UNOS's policy before that time expressly allowing for use of the race-based coefficient to artificially increase Black patients' eGFR scores.

61. Nonetheless, UNOS continued to use the race-based coefficient as a default. For more than six months, UNOS took no affirmative steps to adjust wait times and correct for previous use of the race-based coefficient.

62. On January 5, 2023, UNOS announced a new policy that would require donor hospitals to provide two notifications to patients on the national kidney waitlist, one notifying patients that Black Americans will be considered for wait time adjustments where the race-based coefficient delayed their accrual of wait time, and a second notification confirming this process was completed and informing patients of their status. UNOS also directed donor hospitals to investigate which patients are eligible for a wait time adjustment, and to request said adjustments with UNOS within a year—by January 3, 2024.

63. While this adjustment in policy rightfully acknowledged the racially discriminatory nature of the race-based coefficient, it lacked the requisite urgency, and for many of the 27,500 Black Americans then on the national kidney waitlist, like Mr. Thompson, the policy change was

too little too late. During the 18 months of lag time in adjusting wait times, Black Americans continued to suffer a race-based disadvantage in their candidacy for a donor kidney, with UNet continuing to use the old, improperly calculated wait times when awarding kidneys.

> **D.     As a result of his additional wait time for a kidney transplant, Mr. Thompson suffered significant harms**.

64.     Had the race-based coefficient not been applied to Mr. Thompson's eGFR score, Mr. Thompson would have qualified to join the national kidney waitlist September 12, 2016, his eGFR measuring at 20 ml/min or below.

65.     However, solely because Mr. Thompson is Black, the race-based coefficient was applied to Mr. Thompson's eGFR score to artificially increase his score above 20 ml/min, and relying on the adjusted score, Mass General failed to advise UNOS of the should-be qualifying score from September of 2016.

66.     In reality, Mr. Thompson was first placed on UNOS's national kidney waitlist on July 10, 2017, when he began dialysis.

67.     Since that time, Mr. Thompson has been required to undergo the debilitating dialysis treatments, at home, and at dialysis clinics, discussed above. Both types of treatments have left Mr. Thompson unable to work or enjoy a normal life, and suffering from physical disfigurement, whether it be a tube sticking out of a hole in his stomach, or constantly trimming a scab from his arm so he can stick the sharp dialysis needle back in. Mr. Thompson was stabbed during his time as a corrections officer, and describes the pain he has suffered in dialysis as worse than that incident.

68.     Mr. Thompson also developed kidney cancer in what should have been his fifth year on the national kidney waitlist. Both of his kidneys were removed in a serious, painful surgery. Simply put, since 2017, Mr. Thompson has underwent far too many procedures and doctor's visits

to remember, and has suffered through a great amount of both physical pain and emotional distress, not to mention the economic damages associated with his condition.

69. Living without any kidneys, the intense dialysis treatments do not allow Mr. Thompson to work or earn any income to support his family. At the same time he faces an endless stream of medical costs, including dialysis costs, and the costs associated with his kidney-removal surgery, and other medical procedures.

70. Much, if not all, of this could have been avoided had Defendants not discriminated against Mr. Thompson. Mr. Thompson was entitled to join the waitlist in September of 2016, and should have been approaching five years on the kidney waitlist by the time he was diagnosed with cancer, and forced to go on inactive status. Many similarly-situated non-Black patients spend less time waiting for a donor kidney, and upon information and belief, Mr. Thompson would have received a donor kidney before he was diagnosed with cancer had the Defendants not used the race-based coefficient to his detriment, ending his fight with kidney disease at that time. Instead, Mr. Thompson faces at least two more years of dialysis before he can even be considered for a kidney, not to mention the harms suffered between 2021 and the filing of this action.

## FIRST CAUSE OF ACTION
**(Violation of Title VI of the Civil Rights Act of 1964)**

71. Mr. Thompson re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in the paragraphs above.

72. Mr. Thompson brings this cause of action against all Defendants.

73. UNOS and Mass General receive significant financial assistance from the Federal government.

74. As to UNOS, approximately 10% of UNOS's budget is provided by the Federal government, in accordance with the National Organ Transplant Act's authorization of $7,000,000/year to fund a private, non-profit entity such as UNOS. These contracts were intended

by the Federal government to act as a subsidy to UNOS, not as compensation for any goods or services provided by UNOS to the Federal government, for which there are none.

75. Moreover, UNOS's audited financial statements describe this Federal government payment as a "Grant" and include a corresponding "Federal Assistance Lending Number." Upon information and belief, this number relates to Federal government "Assistance Listings" which, pursuant to the Federal government-run SAM.gov, "are detailed public descriptions of federal programs that provide grants, loans, scholarships, insurance, and other types of assistance awards."

76. Mass General receives significant financial assistance from the Federal government and its programs, funding both patient care and related operations.

77. Defendants have engaged in racial discrimination. As alleged in detail above, Defendants allowed and encouraged use of the race-based coefficient to artificially inflate Black patients including Mr. Thompson's eGFR scores, with UNOS adopting, encouraging, and implementing the race-based coefficient as policy, and its agent transplant hospitals, like Mass General, applying the race-based coefficient directly, thus delaying Mr. Thompson's accrual of wait time, and prejudicing his chances of receiving a donor kidney.

78. Defendants further knowingly input and used these modified wait times for Black patients in UNOS's UNet software, causing Black patients to be ranked lower for specific donor kidneys than non-Black patients. Even after UNOS admitted the practice was racially discriminatory, Mass General failed to take prompt action to ensure Mr. Thompson's wait times was recalculated.

79. Even now, Defendants list Mr. Thompson as "inactive" on the national kidney waitlist, leaving Mr. Thompson ineligible to receive a kidney. Even if required by a prior cancer diagnosis, upon information and belief, Mr. Thompson would have had a transplant prior to his development of kidney cancer, but for use of the race-based coefficient.

80. The damages resulting from the above-described racial discrimination include but are not limited to depriving and/or delaying Mr. Thompson's award of a donor kidney. This discrimination also caused Mr. Thompson to incur economic injuries, including, but not limited

to, continued medical costs such as dialysis costs and lost wages stemming from unemployment because of additional dialysis treatments and other resulting medical conditions caused by application of the race-based coefficient by Defendants.

81. The above-described racial discrimination caused additional damages including but not limited to pain and suffering, severe emotional distress because of the discrimination, fear of looming death, constant fatigue, the inability to travel or exercise, and the loss of enjoyment of life.

## SECOND CAUSE OF ACTION
### (Violation of Crimes Against Chastity, Morality, Morality, Decency and Good Order, M.G.L. Ch. 272, Sec. 98)

82. Mr. Thompson re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in the paragraphs above.

83. This cause of action is brought by Mr. Thompson against all Defendants.

84. UNOS operates and manages the national kidney waitlist, which constitutes a public accommodation because it is open to the general public. Mass General acts as UNOS's agent in managing the national kidney waitlist.

85. Mass General further operates another public accommodation within the state of Massachusetts, relevantly here, a transplant hospital that is open to the general public and provides medical services in exchange for monetary compensation.

86. Defendants engaged in racial discrimination, as described above. To the extent UNOS argues the national kidney waitlist itself is not a public accommodation, UNOS remains liable because it "aides or incites" Mass General's discrimination at its physical transplant hospital.

87. The damages resulting from the above-described racial discrimination include but are not limited to depriving and/or delaying Mr. Thompson's award of a donor kidney. This discrimination also caused Mr. Thompson to incur economic injuries, including, but not limited to, continued medical costs such as dialysis costs and lost wages stemming from unemployment because of additional dialysis treatments and other resulting medical conditions caused by

application of the race-based coefficient by Defendants.

88. The above-described racial discrimination caused additional damages including, but not limited to, pain and suffering and severe emotional distress because of the discrimination, fear of death, constant fatigue, the inability to socialize with family and friends, the loss of enjoyment of life, and physical disfigurement.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Thompson prays for relief against Defendants as follows:

1. For preliminary and permanent injunctions enjoining and restraining UNOS and Mass General, their agents, employees, representatives, partners, joint venturers, and/or anyone acting on behalf of, or in concert with, UNOS or the Mass General from engaging in the above-described racial discrimination;

2. For damages in compensation for the economic and personal injuries suffered by the Mr. Thompson in an amount to be determined by evidence, including but not limited to, his severe emotional distress;

3. For punitive and exemplary damages in an amount according to proof;

4. For statutory damages as provided for by M.G.L. Ch. 272, Sec. 98 of the Massachusetts General Laws;

5. For pre-judgment interest on all damages awarded by this Court;

6. For reasonable attorneys' fees and costs of suit incurred herein; and

7. For such other and further relief as the Court deems just and proper.

|  |  |
|---|---|
|  | The Plaintiff, |
|  | MARK THOMPSON |
|  | By his Attorneys, |
|  | KECHES LAW GROUP, P.C. |
|  | */s/ Jeffrey N. Catalano*_____ |
|  | JEFFREY N. CATALANO |
|  | BBO #: 567798 |
|  | jcatalano@kecheslaw.com |
|  | 2 Granite Avenue, Suite 400 |
|  | Milton, MA 02186 |
|  | TEL: (508) 821-4371 |
|  | FAX: (508) 822-8022 |
| and | ELLIS GEORGE LLP |
|  | MATTHEW L. VENEZIA |
|  | *Pro Hac Forthcoming* |
|  | mvenezia@ellisgeorge.com |
|  | GEORGE LAIOLO |
|  | *Pro Hac Forthcoming* |
|  | glaiolo@ellisgeorge.com |
|  | 2121 Avenue of the Stars, 30th Floor |
|  | Los Angeles, CA  90067 |
|  | TEL: (310) 274-7100 |
|  | FAX: (310) 275-5697 |

## **DEMAND FOR JURY TRIAL**

Mr. Thompson hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

                                        The Plaintiff,

                                        MARK THOMPSON

                                        By his Attorneys,

                                        KECHES LAW GROUP, P.C.

                                        */s/ Jeffrey N. Catalano*_____
                                        JEFFREY N. CATALANO
                                        BBO #: 567798
                                        jcatalano@kecheslaw.com
                                        2 Granite Avenue, Suite 400
                                        Milton, MA 02186
                                        TEL: (508) 821-4371
                                        FAX: (508) 822-8022

and                                      ELLIS GEORGE LLP

                                        MATTHEW L. VENEZIA
                                        *Pro Hac Forthcoming*
                                        mvenezia@ellisgeorge.com
                                        GEORGE LAIOLO
                                        *Pro Hac Forthcoming*
                                        glaiolo@ellisgeorge.com
                                        2121 Avenue of the Stars, 30th Floor
                                        Los Angeles, CA  90067
                                        TEL: (310) 274-7100
                                        FAX: (310) 275-5697

DATED:  JUNE 28, 2024